UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **SHELLEY DAVIS** | **CIVIL ACTION** |
| **VERSUS** | **NO. 18-1878** |
| **STATE OF LOUISIANA** | **SECTION: "A"(5)** |

### REPORT AND RECOMMENDATION

This matter was referred to the undersigned United States Magistrate Judge to conduct a hearing, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts. Upon review of the entire record, the Court has determined that this matter can be disposed of without an evidentiary hearing. *See* 28 U.S.C. § 2254(e)(2). For the following reasons, **IT IS RECOMMENDED** that the petition for habeas corpus relief be **DISMISSED WITHOUT PREJUDICE.**

### Factual and Procedural History

Petitioner, Shelley Davis, is a convicted inmate currently incarcerated at the Plaquemines Parish Detention Center in Louisiana. On May 16, 2013, she was indicted in Orleans Parish for second-degree murder.[1] The Louisiana Fourth Circuit Court of Appeal summarized the following facts established at trial:

On December 12, 2012, Detective Jacob Lundy of the New Orleans Police

---

[1] State Rec., Vol. 1 of 9, Grand Jury Indictment.

Department (NOPD) received a call from dispatch concerning a homicide in the 8900 block of Olive Street. Upon arrival, he observed the victim's body on the sidewalk in front of a vacant lot on Olive Street. Multiple gunshot wounds were visible on the victim's body and several live rounds of ammunition and spent bullet casings were found in close proximity to his body.

Investigation of the crime scene led to witnesses to the shooting. The initial eyewitness identified by investigating officers was Bernard Baker. Mr. Baker was personally acquainted with both the victim and the shooter and was actually standing near the victim at the time of the shooting.

Prior to the shooting, Mr. Baker was standing with defendant and Alton Cooks in Gail Davis's yard on Olive Street. The victim approached and asked Mr. Baker to drive him to make a "run." At that point, the victim was standing on the left side of Mr. Baker, and the defendant was on his right side. The victim did not speak to the defendant or act in an aggressive manner towards her; however, the defendant pulled a gun from her purse and shot at the victim. At that moment, Mr. Baker was standing between the two. The bullet misfired, giving Mr. Baker time to run to the back yard. Mr. Baker heard several shots as he ran, but he did not look back. He heard the victim calling to him for help, but Mr. Baker was too afraid to render aid because the defendant was armed. When the shooting stopped, Mr. Baker returned to the front yard and found the victim lying face down on the ground, he observed Mr. Cooks turn the victim onto his back. The victim was unarmed at the time of the shooting.

The police secured a recorded statement from Mr. Baker and conducted a photographic lineup whereby Mr. Baker positively identified the defendant as the shooter. Det. Cochran secured a warrant of arrest for the defendant. Det. Cochran's investigation also led him to a second witness, Jada Fielder. Although Ms. Fielder did not witness the actual shooting, she heard four or five gunshots as she sat on the porch of her house. Ms. Fielder ran to the scene and saw "Iceman" on the ground. She observed the defendant running away from the area with a gun in her hand. Ms. Fielder gave a recorded statement in which she named the defendant as the shooter and made a positive identification of the defendant in a photographic line-up. At trial Ms. Fielder said she often saw the defendant in the neighborhood carrying a gun. Ms. Fielder recounted that five days prior to the shooting, she spoke to "Fresh" while he was incarcerated in Orleans Parish. "Fresh" called her and asked her to place a three-way call to the defendant for him, which she did. The recording of that phone call was

played for the jury.[2] In the call, the defendant asked Ms. Fielder to tell her what was going on with the victim in the neighborhood. Ms. Fielder said certain neighbors were angry at "Fresh" for robbing the victim. She added that she followed the defendant on Instagram and recalled that two hours after the shooting, the defendant posted a picture of herself on line with the message "Happy Wednesday." Ms. Fielder advised the defendant to erase the picture, which the defendant did. Finally, Ms. Fielder recalled speaking to the defendant after the shooting while they both were incarcerated. The defendant told Ms. Fielder to testify that she did not see the defendant shoot the victim.

Through further investigation, Det. Cochran gained access to the defendant's Instagram account. The Instagram postings were offensive rap lyrics and pictures of the defendant holding semi-automatic weaponry with clip components; all of which was displayed to the jury at trial.

At trial, Sabrina Cooks, a second eyewitness, testified she knew the victim because she dated the defendant's brother for a period of time. Ms. Cooks said the victim was known by his nickname, "Iceman," and that she knew both the victim and the defendant for a long time. At the time the victim was shot, Ms. Cooks was in front of the store on Olive Street, approximately two houses from where the victim was shot. Ms. Cooks indicated that just prior to the shooting, the defendant exited the store and spoke with her, and then the defendant walked across the street and into an alley. Shortly after that, Ms. Cooks noticed the victim walk out of the alley, followed by the defendant. According to Ms. Cooks, the victim did not speak to the defendant or show any aggression toward her prior to the shooting. The defendant simply walked up behind the victim and shot him in the leg. After the victim fell to the ground, the defendant shot him several times and then fled the area in the direction of Hollygrove Street. Ms. Cooks remained at the shooting scene to tell the police the defendant shot the victim. However, Ms. Cooks did not give the police a recorded statement.

Alton Cooks recounted that he, the victim, and Atyia Miller were together at Ms. Miller's house the night before the shooting. At that time, Mr. Cooks saw the defendant leaving a store. The defendant asked Mr. Cooks where the victim was. Although the defendant did not tell Mr. Cooks why she was looking for the victim, Mr. Cooks told the victim of the defendant's inquiry. A short while

---

[2] The jury followed along with a redacted version of the call.

3

later, the victim and defendant said hello to one another, and then the victim went inside Ms. Miller's house.

The following day, Mr. Cooks and the victim returned to Ms. Miller's house. That night, Mr. Cooks observed the defendant near the store and the victim and Mr. Baker standing in front of Ms. Davis's house. As Mr. Cooks walked to the back of the house, he heard gunshots. He walked back out to the front, heard more gunshots and ran to the back again. When the shooting stopped, Mr. Cooks saw the victim lying on the ground. Mr. Cooks examined the victim to determine whether he was alive.

Atyia Miller, the State's final lay witness, testified she remembered the day the victim died. She was living in the 8900 block of Olive Street. On the night before the shooting, the victim, Alton Cooks, and the defendant were at Ms. Miller's house. Mr. Cooks had been speaking to the defendant on the front porch and later went inside and told everyone the defendant had plans to kill the victim.

Dr. Cynthia Gardner, a forensic pathologist employed by the Orleans Parish Coroner's Office, performed and documented the autopsy on the victim's body. She determined the entry and exit paths of the bullets indicated that the victim was shot from the back six times. One of the bullets hit the victim's left internal iliac artery – the second largest blood vessel in the body –causing massive internal bleeding. Dr. Gardner opined that the gunshot wounds to the victim's head and iliac artery would have been rapidly fatal. She recounted that she recovered four bullets from the victim's body during the autopsy.

The defense called Det. Michael McCleary, who testified he assisted Det. Cochran in this investigation. Det. McCleary recalled that he and Det. Cochran took a recorded statement from Bernard Baker at police headquarters after the shooting. Further, Det. McCleary verified more than one person identified the defendant as the shooter during a photographic lineup. He also said Mr. Baker told him he (Mr. Baker) was standing near the victim in the front yard at the time of the shooting. Finally, Det. McCleary corrected the testimony he gave during a pretrial motion hearing concerning the victim grabbing/reaching into the defendant's purse prior to the shooting. He clarified that the victim did not reach into the defendant's purse.

The defendant elected to testify at trial. She explained that she regularly posted "selfies" on Instagram and attached to those pictures lyrics from current gangsta rap songs. The defendant informed the jury that Eric "Fresh"

4

Davis was her brother and that he used to sell drugs. She shared with the jury that she received a three-way call on December 6, 2012, from her brother Eric through Jada Fielder, asking whether the family was working on bonding him out of Orleans Parish Jail. The defendant testified that she knew the victim through her brother Eric and that he sold drugs.

The defendant offered the jury various reasons as to why she feared the defendant and acted in self-defense on the date of the shooting. According to the defendant, the word on the street was that Eric robbed the victim at the London Lodge motel. She also heard that she was in danger from the victim and Mr. Baker. The defendant told the jury that in November 2012, the victim drove to a house the defendant was visiting, jumped from the car, and reached for a weapon. He grabbed for her purse and attempted to rob her. The next time she saw the victim was on December 12, 2012, as she was standing in Ms. Davis's yard, talking to her friend, Mr. Cooks. Mr. Baker walked into the yard and spoke to Mr. Cooks. The defendant was scared because she knew Mr. Baker was loyal to the victim and carried a gun at all times. Afterward, the victim entered the yard, demanding his money from the defendant. When the defendant told the victim that she did not owe him any money, he reached for her purse. As she struggled with the victim over her purse, the defendant pulled a gun from the back of the purse and shot the victim. She ran because she feared Mr. Baker was running to the back of the house to get his gun. The defendant denied threatening the victim. She did not leave her house for a month after the shooting because she feared retaliation from the victim's friends. The defendant turned herself in on February 20, 2013. She also said that she did not know Ms. Miller or have anything to do with her.[3]

Following a jury trial held June 15 through June 18, 2015, Davis was found guilty as charged.[4] On July 30, 2015, the trial court denied her motion for new trial and imposed a sentence of life imprisonment without benefit of probation, parole or suspension of

---

[3] *State v. Davis*, 2016-KA-0078, 2016 WL 7451365 (La. App 4 Cir. 12/28/16) (footnote in original); State Rec., Vol. 8 of 9.

[4] State Rec., Vol. 1 of 9, Minute Entries, 6/15/15 through 6/18/15.

sentence.[5] Her motion to reconsider the sentence was denied.

On direct appeal, Davis raised five assignments of error: (1) the evidence was insufficient to support the conviction for second-degree murder; (2) the improper admission of other-crimes evidence denied her a fair trial; (3) the trial court erred in denying the motion for new trial; (4) the trial court erred in denying her requested jury charge; and (5) the trial court erred in denying the defense motions in limine. On December 28, 2016, the Louisiana Fourth Circuit Court of Appeal affirmed the conviction and sentence.[6] On October 9, 2017, the Louisiana Supreme Court denied the application for writ of certiorari filed by counsel on her behalf.[7] Her conviction and sentence became final 90 days later, on January 8, 2018, when she did not file a writ application with the United States Supreme Court. *Ott v. Johnson*, 192 F.3d 510, 513 (5th Cir. 1999).

Davis did not pursue post-conviction relief in the state courts. Instead, on or about March 10, 2018, Davis filed the instant federal application for habeas corpus relief.[8] In that petition, she asserts seven grounds for relief: (1) judicial bias deprived her of a fair trial; (2) violation of her constitutional right to a "speedy and public trial by an impartial jury of the state or district, wherein the crime should have been previously ascertained by law, to

---

[5] State Rec., Vol. 1 of 9, Minute Entry, 7/30/15.

[6] *State v. Davis*, 16-KA-0078, 2016 WL 7451365 (La. App. 4 Cir. 12/28/16).

[7] *State v. Davis*, 2017-K-0176 (La. 10/9/17), 227 So.3d 831; State Rec., Vol. 9 of 9.

[8] Rec. Doc. 3, Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus.

be in form of the nature of the offense and the cause of accusation, to be confronted with the witnesses against her, to have compulsory process for obtaining witnesses in her favor [and] to have assistance of counsel for her defense"; (3) there was no murder weapon produced to support the charge of second-degree murder; (4) trial counsel was ineffective for failing to oppose zealously the State's evidence at trial; (5) the State's witnesses made statements that were inconsistent, unreliable or otherwise insufficient to support the conviction; (6) she had no prior criminal history; and (7) the conviction was based upon the introduction of inadmissible hearsay evidence.

The State concedes that the federal application is timely. However, the State argues that Davis failed to exhaust state-court remedies as to all of her claims; therefore, the "mixed" habeas petition containing both exhausted and unexhausted claims should be dismissed without prejudice.[9] Davis concedes that her federal application contains some unexhausted claims, which she identifies as Claims 1-4.[10] She filed a document styled, "Amendment of Petition," requesting exclusion of Claims 1-4 from her federal application in order to proceed with Claims 5-7, which she alleges have been exhausted.[11] She also seeks to amend the petition to name her custodian, Warden Denise Narcisse.[12] For the reasons

---

[9] Rec. Doc. 13.

[10] Rec. Doc. 14 (Answer to State's Response), Rec. Doc. 15 (Amendment of Petition for Habeas Corpus Relief).

[11] Rec. Doc. 15.

[12] The State's response notes that Davis has not named her present custodian as the

that follow, the Court finds that only Claim 5—if broadly construed to allege a claim of sufficiency of the evidence—has been exhausted in the state courts on direct appeal. Thus, even her proposed amended petition remains a "mixed" petition subject to dismissal without prejudice for failure to exhaust.

## Analysis

"Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (internal quotation marks omitted). The United States Supreme Court has explained:

> The exhaustion doctrine is principally designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings. Under our federal system, the federal and state courts are equally bound to guard and protect rights secured by the Constitution. Because it would be unseemly in our dual system of government for a federal district court to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation, federal courts apply the doctrine of comity, which teaches that one court should defer action on causes properly within its jurisdiction until the courts of another sovereignty with concurrent powers, and already cognizant of the litigation, have had an opportunity to pass upon the matter.

---

law requires. *See* 28 U.S.C. §§ 2242, 2243; Rule 2(a), Rules Governing Section 2254 Cases in the United States District Courts. Rec. Doc. 13 n. 1. However, in light of the fact that the mixed petition with numerous unexhausted claims presented to this Court is improper and should be dismissed, it is unnecessary and futile for the Court to entertain an amendment to change the name of the respondent. If Davis chooses to proceed with the exhausted claim as discussed later in this report, she will have an opportunity to name the proper custodian.

*Rose v. Lundy*, 455 U.S. 509, 518 (1982) (citations, footnote, quotation marks, and brackets omitted).

In order to exhaust fully, the substance of the federal habeas claim must be fairly presented to the highest state court. *Whitehead v. Johnson*, 157 F.3d 384, 387 (5th Cir. 1998). The requirement applies to *all* levels of review in the state court system, meaning that a petitioner's federal claim must have been "fairly presented" to "*each* appropriate state court (including a state supreme court with powers of discretionary review)." *Baldwin*, 541 U.S. at 29 (emphasis added). "State prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process," including discretionary review when that review is part of the State's ordinary appellate review procedures. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

"A federal court claim must be the 'substantial equivalent' of one presented to the state courts if it is to satisfy the 'fairly presented' requirement." *Whitehead*, 157 F.3d at 387 (citing *Picard v. Connor*, 404 U.S. 270, 275-78, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971)). "This requirement is not satisfied if the petitioner presents *new legal theories* or *new factual claims* in his federal application." *Id.* at 387 (emphasis added) (citing *Nobles v. Johnson*, 127 F.3d 409, 420 (5th Cir. 1997)). Nor is the fair presentation standard satisfied if the state court must read beyond the petition or brief, for instance to a lower court opinion, to identify the claim. *See Baldwin*, 541 U.S. at 32.

Davis does not dispute that her first four claims have not been properly exhausted. She has filed an amendment to her petition seeking to withdraw those claims. However, she incorrectly alleges that the remaining three claims have been properly exhausted in the state courts. As the State correctly notes, Davis's federal application presents at most only one exhausted claim for relief, *i.e.*, Claim 5, involving inconsistencies in witness statements at trial, which liberally construed was before the state courts on her assigned error regarding insufficiency of the evidence. A review of her counseled appellant brief on direct appeal and her writ application filed with the Louisiana Supreme Court shows that she did not fairly or otherwise present Claims 6 or 7, which concern her criminal history and inadmissible hearsay.[13] Nor did she attempt to pursue her right under state law, which remains available, to raise these claims by application for post-conviction relief filed within two years of the date the conviction and sentence has become final. La. Code Crim. P. art. 924 *et seq.* (Post-Conviction Relief). Thus, in addition to the first four claims, her last two claims are un-exhausted. 28 U.S.C. § 2254 (c).

Davis's federal application is a mixed petition, containing both exhausted and unexhausted claims, and should be dismissed without prejudice. *Alexander v. Johnson*, 163 F.3d 906, 908 (5th Cir. 1998) ("A habeas petition containing both exhausted and unexhausted claims is a 'mixed' petition which should be dismissed without prejudice."). Although the Supreme Court has recognized the availability of a stay and abeyance approach

---

[13] State Rec., Vol. 8 (Appellant Brief) and Vol. 9 (Application for Writ of Certiorari).

for "mixed" petitions due to the AEDPA's one-year statute of limitations, it has held that such a remedy must be exercised only in "limited" circumstances. *Rhines v. Weber*, 544 U.S. 269, 277-78 (2005). The Court has cautioned that "because granting a stay effectively excuses a petitioner's failure to present his claims first to the state courts, stay and abeyance is only appropriate when the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court." *Id*. The record in this case discloses no good cause for Davis's failure to properly and fully exhaust each of her claims in the state courts. Assuming she pursues relief diligently, the statute of limitations should not prevent Davis from seeking federal habeas relief in the future. Davis's conviction became final on January 8, 2018. Thus, absent tolling, she has one year, or until January 8, 2019, in which to file her federal habeas petition. 28 U.S.C. § 2244(d)(1)(A).

Accordingly, the petition should be dismissed without prejudice to allow Davis to fully exhaust available state remedies as to all of her claims, unless she chooses to amend the habeas petition to dismiss or withdraw *all* of the unexhausted claims (Claims 1-4 *and 6-7*) and proceed with the sole exhausted claim (Claim 5). *Pliler v. Ford*, 542 U.S. 225, 233 (2004) (citing *Rose*, 455 U.S. at 510).

## RECOMMENDATION

Accordingly, unless Davis amends her federal petition to withdraw all of her unexhausted claims and present only her single exhausted claim alleging insufficient evidence to sustain the conviction, **IT IS RECOMMENDED** that Davis's application for federal

habeas corpus relief be **DISMISSED WITHOUT PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[14]

New Orleans, Louisiana, this ‎ 3rd ‎ day of ‎ August ‎, 2018.

_____
MICHAEL B. NORTH
UNITED STATES MAGISTRATE JUDGE

---

[14] *Douglass* referenced the previously applicable 10-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to 14 days.